EMMA L. REDDEN *et al.*

*v.*

JAMES A. MILLER *et al.*

*Filed at Mt. Vernon June 14, 1880.*

1. SUBSEQUENT PURCHASER—*as to payment of purchase money under prior purchase.* In a controversy between a prior and subsequent purchaser of land, in regard to the title, the former alleging that the latter was not a *bona fide* purchaser for value without notice, it is a matter of no concern to the subsequent purchaser whether the prior purchaser has paid the whole amount of the purchase price under his contract or not. If the vendor is satisfied in that regard, the subsequent purchaser can not complain.

2. SAME—*without consideration—of his relation to the prior purchaser.* A purchaser of land, to whom a deed had been made, reconveyed to his grantor, and thereupon the latter sold the land to another, giving a bond for a deed. Neither the reconveyance nor the bond was put upon record. After these transactions, the first purchaser, who had reconveyed to his grantor, sold and conveyed to a third person under this arrangement: that the grantee should clear the title from a prior mortgage on the land, make sale of the land, and pay to his grantor one-half the proceeds,—so that really he paid nothing for the land. It was *held,* this last purchaser simply stood in the shoes of his grantor, and held the legal title subject to all the equities which were binding upon him in respect to the second and intervening purchaser.

3. DELIVERY OF DEED—*surrender of notes.* Where, upon the cancelling of a contract for the sale and conveyance of land, it was agreed between the

parties that the grantee should execute a deed reconveying to his grantor, and the latter should surrender the notes given him for the purchase money, and that the deed of reconveyance should be placed in the hands of a third person, to be delivered to the grantee therein whenever the latter should place in the hands of such third person the notes mentioned, it was *held,* the delivery of the deed of reconveyance into the hands of the custodian designated was a delivery to the grantee therein, and the placing of the notes in his hands was a surrender of them to the maker, so that thereby the title to the land became reinvested in the original grantor.

4. NOTICE TO SUBSEQUENT PURCHASER—*what constitutes.* Where a purchaser of land knows at the time of his purchase that another person has for years claimed the land and paid taxes thereon, it is his duty, before making his purchase, to go to such claimant and ascertain from him what title he has, and if he fails to make such inquiry, he will be chargeable with knowledge of all facts which he might thereby have learned, and will hold subject to the equitable rights of the claimant under an unrecorded bond for title. Whatever is sufficient to put a purchaser upon inquiry is good notice of all facts which the inquiry would have disclosed.

5. SAME—*effect of notice after purchasing, in respect to unpaid purchase money.* In order to the protection of a subsequent purchaser who does not receive notice of prior equities until after his purchase, it must appear that he has actually paid the purchase money, or, if he has paid a part of the purchase money before receiving notice, he will be protected to that extent, but no further.

WRIT OF ERROR to the Circuit Court of White county; the Hon. THOMAS S. CASEY, Judge, presiding.

Mr. ANDREW D. DUFF, and Mr. CARL ROEDEL, for the plaintiffs in error:

The position, that defendants Miller and the Hales are innocent purchasers, or purchasers without notice, finds but little support from the evidence. Franklin Hale, in his deposition, says there may have been something said to the effect that the Jones estate had, for a number of years previous, been claiming the land, and that he and his son, at the time of the purchase, knew that Jones' heirs had paid taxes on the land for about fourteen years, and he supposed they had owned it that long, and that no one had been in the actual possession. This was enough to put any prudent man upon inquiry, who wished to know the equitable rights of others. *Hudson v.*

*Warner,* 2 Harris & Gill, 415; *Russell* v. *Petree,* 10 B. Mon. 186; *Hankinson* v. *Barbour et al.* 29 Ill. 280; *Bunting* v. *Ricks,* 2 Dev. & Bat. Ch. 130; *Price* v. *McDonald,* 1 Md. 403.

The question is not, did the Hales know the rights of Jones, but were they possessed of such information as made it their duty, before purchasing, to make inquiry from the proper source as to the rights of the heirs of Jones; and would an inquiry have led to a discovery of their rights. They are chargeable with notice of all facts such an inquiry would have disclosed. *Nute* v. *Nute,* 41 N. H. 60; *Danforth* v. *Dart,* 4 Duer, 106; *Worthington* v. *Morgan,* 16 Sim. 547; *Russell et al.* v. *Ransom,* 76 Ill. 168; *Watt* v. *Scofield,* id. 264.

The evidence is, Edwards had not received one cent for this land. The purchaser was to pay nothing until he recovered the land, and then was to give Edwards one-half of the proceeds for which it should be sold. The Hales were to pay $1000 for the land they bought—paid $25 down and gave their notes, payable in one, two, three and four years, for the balance. Under these facts, they are not *bona fide* purchasers without notice. They must not only have acquired the legal title without notice, but must also have paid the purchase money without such notice.

If the purchaser receives notice before actual payment of the purchase money, he is not a *bona fide* purchaser. Notice before payment of the purchase money is good, although it be secured by note and mortgage already made; and part payment of the purchase money before notice will only protect the purchaser *pro tanto.* *Brown et al.* v. *Welch,* 18 Ill. 343; *Moshier* v. *Knox College,* 32 id. 164–5; *D'Wolf* v. *Pratt,* 42 id. 310–11; *Haw* v. *Weldon,* 2 Ves. 516; *Blight* v. *Banks,* 6 Mon. 192; *Story* v. *Windsor,* 2 Atk. 630; *Wormley* v. *Wormley,* 8 Wheat. 318; Kerr on Fraud and Mistake, 318–19.

But as to Miller there is not one element of a *bona fide* purchase to be claimed by him in this transaction. According to his answer and sworn deposition, the contract between him and Edwards was, that Edwards conveyed him the entire

tract of land, and he assumed the burden and expense of clearing it of the lien of the Dickinson mortgage, and, when he sells it, to pay Edwards one-half the proceeds. This is clearly within the Champerty act, and smacks of crime. *Thompson* v. *Reynolds,* 73 Ill. 11; *Coleman* v. *Billings,* 89 id. 183.

But treating the transaction as legal, then Miller is but a trustee for Edwards, and holds the title as such, and is subject to all the equities which bound Edwards. See *Provost* v. *Gratz,* 1 Peters' C. C. 364.

Did the deed of Edwards left with Hinch, in 1858, pass his title in the land to Kirkham?

We maintain this deed became operative and effectual as soon as Kirkham delivered to Hinch these notes of Edwards which were found with this deed, among the papers of Hinch, after his death.

Notwithstanding the deed was not delivered directly to Kirkham, yet Edwards parted with it and all control over it. It is found in the hands and possession of a stranger, and thus the effect and character of the deed are purely a question of intention. *Price, etc.* v. *Pittsburgh, Ft. Wayne and Chicago Ry. Co.* 34 Ill. 36; *Byers* v. *McClanahan,* 6 Gill & J. 250; *Masterson et al.* v. *Cheek,* 23 Ill. 76; *Tate* v. *Tate,* 1 Dev. & Bat. Ch. 22; *Fearrer* v. *Bridges,* 5 Humph. 44; *Gardner* v. *Collins,* 3 Mason, 398.

Anything which clearly manifests the intention of the grantor that the deed shall presently become operative is effectual as a delivery. *Bryan et al.* v. *Wash,* 2 Gilm. 557; *Souverbye* v. *Arden,* 1 Johns. Ch. 240.

The defendants on the hearing introduced in evidence the entire record and depositions in a case of foreclosure by the complainant as executor, etc., in the fall of 1875, on the old mortgage known as the "Dickinson mortgage."

The executor found this mortgage among the papers of his testator, but found no notes it was given to secure, and the suit was brought to ascertain if the mortgage was satisfied or not.

Why was that record introduced? If there is anything in it operating as an estoppel, the defendant should have made that defence by plea or otherwise, informing complainants of the particular part of the record and the facts therein relied on, and, having failed to do so, they can not avail themselves of any fact therein in estoppel. *Smith* v. *Whittaker,* 11 Ill. 417; Bigelow on Estoppel, 589–90.

The bill in that case was not sworn to, therefore no statement in it can be set up in estoppel of complainants' rights in any other suit or proceeding, for the reason the facts stated in such bills are generally the mere suggestions of counsel, made for the purpose of obtaining an answer to the bill. 1 Greenleaf's Ev. sec. 551 and notes; *Harding* v. *Town of Hale,* 61 Ill. 196–7.

But certainly there is nothing in that case, even if the bill had been sworn to, which can upon any known principles of law be invoked by way of estoppel to bar complainants from obtaining the relief prayed for in this bill. *Letcher* v. *Morrison,* 27 Ill. 209; *Dorlarque et al.* v. *Cress et al.* 71 id. 380; *Harding* v. *Town of Hale,* 61 id. 196–7; *Fetrow* v. *Merriwether,* 53 id. 275; *McClurken* v. *McClurken,* 46 id. 327.

Mr. JOHN M. CREBS, for the defendants in error, after stating the facts at considerable length, contended that, as against the complainants, the defendants at the time of the commencement of the suit, had the full, perfect and complete legal title to the land, there being nothing of record to show that complainants had any claim or interest therein; that the defendants, by reason of the part payment of the purchase money, became seized of the equitable title to the lands, and that unless the complainants have an equitable title, based upon payment of the purchase money and the payment shown by testimony, they have no standing in court.

He also contended that complainants had, in fact, no title of which the defendants could take notice by any inquiry.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in equity, brought by the complainants, the executor and heirs at law of the estate of John T. Jones, deceased, against James A. Miller and others, to enforce the specific performance of a contract under which Robert Kirkham sold to John T. Jones certain real estate in White county, consisting of two hundred and forty acres, and to compel defendants to convey the title by them held to complainants. On the hearing the court rendered a decree dismissing the bill, and the complainants sued out this writ of error.

The land in question was originally owned by Robert Kirkham, who, in March, 1851, mortgaged it to one Dickinson for $2400, who placed the mortgage on record. On the 10th day of March, 1855, Kirkham sold and conveyed the land to James Edwards. This deed was placed upon record. Afterwards Edwards discovered that the mortgage given to Dickinson was not canceled of record; he became dissatisfied with the purchase, and complainants contend the trade was canceled between Kirkham and Edwards, the latter executing a deed conveying the lands back to Kirkham, which was dated January 12, 1858, and left in the hands of Benj. P. Hinch. The notes, amounting to $400, which Edwards had given for the land, were also left with the same party.

After this transaction, and on the 9th day of November, 1860, Kirkham executed and delivered a bond for a deed to John T. Jones, in which he agreed to convey the lands on certain conditions named in the bond. This bond was never recorded, and the deed from Edwards to Kirkham was not placed upon record. Jones died in 1863, but he in his lifetime, and the executors of his estate after his death, claimed the land and regularly paid the taxes thereon, except for the years 1874 and 1875, from the date of the bond. On the 5th day of December, 1874, Edwards conveyed the lands to James A. Miller, one of the defendants, but no consideration was paid for the conveyance. On the 21st of April,

1875, Miller sold and conveyed to Franklin Hale, one of the defendants, forty acres of the land for $333.33, and about the same time he sold John Hale, a son of Franklin Hale, eighty acres of the land for $666.66. John Hale, soon after his purchase, died, and his widow and heirs were made defendants in the bill. The remaining one hundred and twenty acres are still held in the name of Miller. On the 8th day of October, 1875, and before the commencement of the suit, Kirkham and wife, in pursuance of the terms of the bond which had been given to Jones, conveyed the land to the executor of the estate of Jones.

The proof is not clear in regard to the amount Jones agreed to pay for the lands, nor is it entirely clear that the whole amount has been paid; but there is no controversy between Kirkham and complainants, in regard to this matter, and if it be true that the whole amount of the contract price has not been paid, that fact, so long as Kirkham is satisfied, does not concern the other defendants, or in any manner affect their rights in the lands. The complainants derive their title to the lands after Kirkham had sold and conveyed to Edwards, and, unless Kirkham had obtained the title back from Edwards, of course he had nothing to sell, and complainants obtained no right or title to the land under the bond given by Kirkham to Jones.

The important question in this case, then, is whether the trade between Edwards and Kirkham was canceled and the lands reconveyed. This question will have to be settled by the evidence. It is quite clear, from the evidence, that the price Edwards agreed to pay for the land was $400,—it is admitted in the answer that this was the amount. Notes were executed by Edwards to Kirkham for this amount, except perhaps $50, which was paid in cash.

Edwards, although an interested party, testified that on the 11th of January, 1858, he met Kirkham at New Haven, and told him he must clear the title to the land or give back his notes and money; that Kirkham agreed to pay back the

money, give up the notes, and pay him $50 for his trouble. He finally agreed to take a load of corn for his trouble, which he received. He executed a deed conveying back the property, which was left with B. P. Hinch, to be delivered to Kirkham when he surrendered Edwards' notes and repaid the money he had received.

Kirkham, in his evidence, does not agree with Edwards. He says they agreed to cancel the trade. " I was to give up his notes, and he was to make me back a quitclaim deed." He says the notes were left with Hinch to be given to Edwards, and his impression is that the amount Edwards had paid on the land was paid back to him.

Mr. Hinch, the custodian of the notes and deed, is dead, but his son, who seems to be entirely disinterested, says that he found the deed from Edwards to Kirkham, and the notes for the $400, among his father's papers; that in the fall of 1874 he had a conversation with Mr. Edwards in relation to the transaction; that Edwards told him he had paid Kirkham $50 and given his notes for the balance; that after he bought the land he found it was incumbered for four or five thousand dollars; that he went to Kirkham about it, and he paid him back the $50 he had paid, in corn, and they agreed that Kirkham should leave Edwards' notes with his father, and he was to make out a deed; when executed by Edwards and wife, conveying back their rights to the lands to Kirkham, his father was to deliver up to Edwards his notes, and Kirkham was to have the deed, and the trade was to be canceled; that he, though he and his wife had executed the deed, did not get his notes, but he didn't care for that, as the notes were now void by the Statute of Limitations.

The truth of the statements of this witness seems to be corroborated by the conduct of Edwards and Kirkham after the arrangement was made, and is in harmony with all the facts in the case. If Edwards had not canceled the trade, and given up the land, why did he abandon it, and set up no

claim whatever to the property after 1858 until 1875, when he found the deed from him to Kirkham was not on record?

Edwards paid no taxes on the land, exercised no acts of ownership over it, and although he resided in the same neighborhood, was never heard to claim the property after he arranged with Kirkham to cancel the trade, until 1875. This conduct on his part shows clearly that the intention was to convey the property back to Kirkham by the delivery of the deed to Hinch.

Again, the conduct of Kirkham is consistent with the theory that he had taken back the land, and irreconcilable with the idea that he had not. It is unreasonable to believe that he would have sold the land to Jones if he had not taken it back, when Edwards resided in the same neighborhood, and would have known at once of the transaction, and doubtless denounced and condemned it.

We are, therefore, of opinion that the testimony shows that Edwards conveyed the property back to Kirkham, that the delivery of the deed to Hinch for and on behalf of Kirkham, was a delivery to Kirkham, and the delivery of the notes, which were given for the land, was a surrender of them to Edwards, and thus whatever title Edwards had acquired under his purchase was reconveyed and became vested in Kirkham.

The next question presented by the record is whether Miller and the Hales are *bona fide* innocent purchasers without notice of the rights of complainants in the lands. If they are, then, although Edwards reconveyed the land back to Kirkham and he sold to Jones, they are entitled to be protected in their purchase. The land was vacant; the bond from Kirkham to Jones was not on record, nor was the deed from Edwards to Kirkham on record. So far, therefore, as notice under the recording laws is concerned, neither Miller nor the Hales were chargeable with notice of the prior conveyances. But Miller was not a *bona fide* purchaser of the lands; he paid nothing for the conveyance made to him by Edwards. The substance of the arrangement made was that Edwards

was to convey to him, and he was to clear the title of the Dickinson mortgage, make sale of the lands, and pay Edwards one-half of the proceeds. Miller merely stepped into Edwards' shoes and held the legal title subject to all the equities which were binding upon Edwards. Had he made an absolute purchase, received a deed and paid the consideration, he would have occupied a different position.

But, independent of this, the evidence shows that Miller had actual notice before he received the deed that Edwards had previously conveyed to Kirkham.

John Humphreys, a disinterested witness, testified to a conversation which occurred between Miller and Kirkham, in which Miller said Edwards had told him the title to the land was not good; that he had returned it to Kirkham.

We now come to the purchase made by the Hales of Miller. Hale, in his evidence, admits that he and his son, before they purchased, knew that the Jones' had been claiming the land for a number of years. He said: "My son and I knew, at the time of the purchase, that Jones' heirs had paid taxes on it for about fourteen years, and I supposed they had owned it that long."

If the Hales, when they purchased, knew the Jones heirs were claiming the lands and paying taxes thereon, as they admit they did, then it was their duty, before making the purchase, to go to the Jones heirs and ascertain from the proper source what title they had, and if they failed to make inquiry they are chargeable with the knowledge of all facts which they might have obtained by going to the Jones heirs and making inquiry. In other words, the Hales, having received notice before making the purchase that the Jones heirs claimed the lands and had been paying taxes thereon for a number of years, are chargeable with notice of all facts in relation to the title which they might have learned had they pursued the information they had to its legitimate source. *Russell* v. *Ranson,* 76 Ill. 167; *Watt* v. *Scofield,* 76 id. 261.

It is a common, well understood doctrine, that whatever is sufficient to put a purchaser upon inquiry is good notice of all facts which the inquiry would have disclosed.

We do not, therefore, think the Hales were purchasers without notice of complainants' title to the land, but if they had been, as they had only paid on the purchase when the suit was commenced $25, they could not be regarded as *bona fide* purchasers. In order to be protected in the title they purchased, it should appear that they not only bought without notice, but had actually paid the purchase money before receiving notice. If they had bought without notice and paid a portion of the purchase money before receiving notice, doubtless they would be entitled to protection for the amount they had actually paid, but no further. *Moshier* v. *Knox College,* 32 Ill. 155.

We are of opinion that, under the evidence, complainants were entitled to a decree, and it was error to dismiss the bill.

The decree will be reversed, and the cause remanded for further proceedings consistent with this opinion.

*Decree reversed.*